IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TIMOTHY CONNELLY, DAVID WINCHELL,
RAYMOND SCHLICHT, and RODNEY SCHLICHT,

                Plaintiffs,

  v.                                              OPINION & ORDER

DAN LEPKE TRUCKING LLC,                       15-cv-308-jdp
LEPKE TRUCKING & EXCAVATING LLC, and
DANIEL LEPKE,

                Defendants.

---

Plaintiffs Timothy Connelly, David Winchell, Raymond Schlicht, and Rodney Schlicht bring this proposed collective action against their former employers, defendants Dan Lepke Trucking LLC, Lepke Trucking & Excavating LLC, and Daniel Lepke. Plaintiffs allege violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, and Wisconsin prevailing wage laws. Plaintiffs contend that defendants: (1) failed to compensate plaintiffs for work performed before they loaded their trucks for the first time each day and after they unloaded their trucks for the last time each day, in violation of the FLSA and Wisconsin law; (2) failed to compensate plaintiffs for overtime work, in violation of the FLSA and Wisconsin law; (3) deducted wages from plaintiffs' paychecks for damage to property when plaintiffs did not have the opportunity to demonstrate that they did not cause the damage, in violation of Wisconsin law; and (4) failed to pay plaintiffs overtime when they worked more than 40 hours per week on Wisconsin prevailing wage projects, in violation of Wisconsin law. The court granted the parties' joint motion for conditional class certification on January 7, 2016. Dkt. 29.

Pursuant to discussions with Magistrate Judge Stephen L. Crocker during a February 16, 2016 telephone conference, defendants filed a motion to resequence several pretrial motion deadlines. Dkt. 62. Defendants asked the court to consider whether plaintiffs are exempt from FLSA overtime pay under the motor carrier exemption, 29 U.S.C. § 213(b)(1), before the court considers a motion for class certification under Federal Rule of Civil Procedure 23. In the interests of efficient case management, the court granted the motion.

Now defendants' motion for summary judgment based on the motor carrier exemption is fully briefed. Dkt. 75. Because defendants have not made the necessary evidentiary showings, the court will deny the motion.

## THE MOTOR CARRIER EXEMPTION

The nature of the motor carrier exemption informs the court's understanding of the relevant facts. So the court will begin there.

"Congress . . . has exempted a range of employees from the [FLSA's] overtime provisions, including interstate drivers whose maximum hours are regulated by the Department of Transportation." *Almy v. Kickert Sch. Bus Line, Inc.*, 722 F.3d 1069, 1070 (7th Cir. 2013) (citing 29 U.S.C. § 213(b)(1)). These employees are FLSA-exempt because the Department of Labor (via the FLSA) cannot regulate employees subject to another agency's jurisdiction. The Department of Transportation has jurisdiction

> to establish qualifications and maximum hours of service for employees of a motor carrier if "property . . . [is] transported by [the] motor carrier between a place in a State and a place in another State," 49 U.S.C. §§ 13501(1)(A), 31502(b), provided that the employees "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property

> in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a).

*Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 897 (7th Cir. 2009) (alterations in original) (citations omitted). So "the Secretary of Labor has jurisdiction over employees that work for a motor carrier 'engage[d] wholly in intrastate commerce,' [and] the Secretary of Transportation has jurisdiction under the Motor Carrier Act over employees of motor carriers 'that engage[ ] in interstate commerce . . . .'" *Cantu v. Brink's Co.*, 186 F. Supp. 3d 846, 2016 WL 2609989, at *2 (N.D. Ill. 2016) (first and last alterations in original) (quoting *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 660-61 (7th Cir. 2011)).

Motor carriers often work in both intra- and interstate commerce, but an employee cannot be subject to both the FLSA and the Motor Carrier Act at the same time. *Johnson*, 651 F.3d at 661. So the court must determine how much interstate commerce is enough to move an employee out from under the FLSA. "An employee comes within the Secretary of Transportation's jurisdiction so long as the employee is 'subject, at any time, to be[ing] assigned to interstate trips.'" *Id.* (alterations in original) (quoting *Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 235 (7th Cir. 1961)). Even "minor involvement in interstate commerce as a regular part of an employee's duties" may subject an employee to the Secretary of Transportation's jurisdiction. *Id.*; *see also Morris v. McComb*, 332 U.S. 422, 431-32 (1947) (emphasizing the character of an employee's work over the percentage of time devoted to interstate commerce). Once an employee engages in interstate commerce—or, if not, once the motor carrier has engaged in interstate commerce and the employee could reasonably be expected to make an interstate trip—the employee is subject to the Secretary of Transportation's jurisdiction for four months. *Johnson*, 651 F.3d at 661 (citing Application of the Federal Motor Carrier Safety Regulations 46 Fed. Reg. 37,902 (July 23, 1981)).

A driver may be reasonably expected to make interstate runs when "interstate commerce trips [are] distributed generally throughout the year and their performance [is] shared indiscriminately by the drivers." *Morris*, 332 U.S. at 433. "The point of requiring a motor carrier to show that it regularly engages in interstate commerce is to prevent employers from circumventing . . . the FLSA by claiming that their employees are used in interstate commerce even though the likelihood of an employee being sent on an interstate run is remote." *Johnson*, 651 F.3d at 663.

Here, the parties agree that Dan Lepke Trucking and Lepke Trucking & Excavating are motor carriers. The parties dispute the location of the work performed.

FACTS

Having identified the relevant inquiry—whether and to what extent plaintiffs made interstate trips or expected to make interstate trips—the court turns to the facts. Very few facts are undisputed. Where plaintiffs object to a proposed finding of fact because the underlying source material is not admissible, but do not dispute the proposed fact, the court will accept the fact (for now) and will address evidentiary issues later in this opinion.

Defendant Dan Lepke Trucking LLC transports bulk commodities (gravel, sand, stone, etc.) in dump trucks for hire. Defendant Lepke Trucking & Excavating LLC is an excavating company. Defendant Daniel Lepke and his wife, Ruth Lepke (a non-party), were sole owners of both companies during the relevant time period. Dan Lepke Trucking is located in Wisconsin, but it also performs trucking services in Minnesota and Iowa.

Defendants employed plaintiffs as dump truck drivers at various points between 2012 and 2015. Defendants contend that between 2012 and 2015, their drivers—including

plaintiffs—transported hundreds of shipments in interstate commerce. As a result, so defendants contend, the motor carrier exemption applies to the entire time period at issue.

**A. Disputed locations**

At some point the court will have to discuss who traveled where. But first, the parties dispute the locations of several key pickup and delivery points. Whether these stops fall within one state or another will determine whether certain routes were intrastate or interstate.

Drivers picked up river sand from a sand pit "across the final stretch of the Mississippi River from Lansing, Iowa." Dkt. 83, ¶ 6. We will call this location the Lansing pit. Defendants contend that the Lansing pit is in Iowa. Plaintiffs contend that the Lansing pit is in Wisconsin.

Drivers delivered materials to Lock & Dam #7 on the Mississippi River. Defendants contend that Lock & Dam #7 is in Dresbach, Minnesota. But plaintiffs disagree and offer Google Maps printouts in an effort to show that Lock & Dam #7 is on the Wisconsin side of the Mississippi River. To rebut plaintiffs' assertions, defendants offer William Lepke's declaration. William is Daniel Lepke's son; he owns his own trucking company and claims to be familiar with his parents' companies. According to William, Lock & Dam #7 is in Minnesota: the lock is on the Minnesota shore and the dam extends across the channel. He concedes that he does not know exactly where the Minnesota-Wisconsin border falls, but he states that all deliveries to the lock must go through Minnesota because drivers cannot access the lock from Wisconsin. Plaintiffs, in response, identify "access roads" to the dam from Wisconsin, as purportedly depicted in the Google Maps printouts.

Drivers delivered materials to two barges on the Mississippi River: one near Stoddard, Wisconsin, the other between Wisconsin and Iowa. The barges then delivered the materials to islands in the middle of the river. Neither party offers any concrete evidence that identifies whether the islands are on the Wisconsin or the Iowa side of the river.

Defendants contend that Rodney Schlicht and other drivers delivered materials from Wisconsin to La Crescent, Minnesota. But according to Rodney Schlicht, he delivered the materials to French Island, Wisconsin, (near La Crescent) and did not cross into Minnesota.

Drivers hauled sand from Brownsville, Minnesota, to the Minnesota side of a bridge project on the Minnesota-Wisconsin state line (the I-90 bridge project). Plaintiffs contend that the trips did not require drivers to cross into Wisconsin; the trips fell entirely within Minnesota. But William Lepke states that he personally drove from Brownsville, Minnesota, to the I-90 bridge site, and it was "impossible to get to the destination (which was on the Minnesota side) without crossing into Wisconsin." Dkt. 90, ¶ 4.

Drivers delivered sand from pickup points in Wisconsin to a facility in Oakdale, Wisconsin. By itself, such a trip is clearly intrastate. But defendants contend that the sand shipments were immediately carted off to North Dakota and Texas following drop-off and that, as a result, the entire route was one big interstate shipment. Plaintiffs do not offer any evidence to rebut this contention, but they argue that defendants have not offered any evidence to support their position regarding the North Dakota and Texas shipments. Plaintiffs want additional time to conduct discovery on the issue.

B. Plaintiffs' travel

Connelly worked for defendants between May 2012 and February 2015. At various points, Connelly picked up river sand from the Lansing pit and hauled sand from Brownsville

to the I-90 bridge project. While working on the bridge project from December 2013 through April 2014, Connelly traveled between locations in Wisconsin, and he "cannot recall a single instance where a driver drove to the Minnesota side of the bridge, or performed any other work in Minnesota." Dkt. 83, ¶ 15. But Connelly made multiple deliveries from Wisconsin to the Minnesota side of the bridge project later in 2014. Plaintiffs concede that Connelly was exempt from FLSA overtime pay from April 16, 2014, through May 9, 2014, and after November 18, 2014. Dkt. 81, at 4.

Raymond Schlicht worked for defendants from 2011 through early 2015. Raymond delivered materials from Wisconsin to the Oakdale facility, to Lock & Dam #7, and to the barges on the Mississippi. Raymond picked up river sand from the Lansing pit and hauled sand from Brownsville to the I-90 bridge project. Raymond also delivered materials for "Antonio" (a private project) to a location underneath a bridge between Wisconsin and Iowa. According to Raymond, "If the final stretch of the Mississippi River across from Lansing is the border between Wisconsin and Iowa, then all of the deliveries for Antonio would be to a location in Wisconsin rather than Iowa." Dkt. 84, ¶ 11.

Rodney Schlicht worked for defendants from April 2012 to early 2015. Rodney worked with his father, Raymond, making deliveries to the Oakdale facility, to Lock & Dam #7, from the Lansing pit, and to the barges. Rodney also hauled sand from Brownsville to the Minnesota side of the bridge project and delivered materials to French Island. The Schlichts delivered materials to Lansing, Iowa, from Wisconsin at least once. Dkt. 92, ¶ 92. Plaintiffs concede that the Schlichts were exempt from FLSA overtime pay from November 12, 2013, though March 12, 2014.

Finally, during the four weeks that Winchell worked for defendants, he delivered materials from Brownsville to the I-90 bridge project.

**C. Other employees' interstate travel**

If defendants' travel summaries are to be believed, Dan Lepke Trucking employees—including the Schlichts—made many interstate trips in 2012, including trips to the Oakdale facility (where the sand shipments would go on to North Dakota or Texas); trips from Wisconsin to Lock & Dam #7 in Dresbach, Minnesota; and trips from Wisconsin to La Crescent, Minnesota. Dkt. 89-1; Dkt. 89-2; Dkt. 89-3; Dkt. 89-4. Employees—including the Schlichts—also made interstate trips in 2013, including trips between Iowa and Wisconsin; trips between Minnesota and Wisconsin; and trips to the Mississippi barges, where the shipments would go on to islands on the Iowa side of the Mississippi River. Dkt. 89-5 and Dkt. 89-6. In late 2013 to early 2014, the I-90 bridge project had employees—including plaintiffs—hauling sand from Brownsville to the Minnesota side of the bridge site. Dkt. 89-7. Employees also made trips between the Minnesota side of the bridge site and locations in Wisconsin. Dkt. 89-8; Dkt. 89-9; Dkt. 89-10; Dkt. 89-11.

ANALYSIS

Before doing anything else, the court must address defendants' glaring failure to comply with the court's summary judgment procedures. *See* Dkt. 12. At summary judgment, the moving party must offer proposed findings of fact that include "[a]ll facts necessary to sustain a party's position on a motion for summary judgment." *Id.* at 8. And the proposed facts must cite admissible evidence. The court explicitly warned defendants that it would not

search the record for evidence and that it would not consider evidence in the record not offered via a properly supported proposed finding of fact. *Id.*

Defendants' motion relies on defendants' contention that their drivers, including plaintiffs, transported hundreds of shipments in interstate commerce during the relevant time period. Defendants purportedly rely on "thousands of shipping documents and other records" to support this contention, Dkt. 77, ¶ 7 and Dkt. 89, ¶ 7, but defendants do not offer or cite the documents themselves. Rather, defense counsel prepared "a series of summaries of such shipments." *Id.* Defense counsel then distilled and explained the information in his declaration, Dkt. 77, having reviewed the source documents and spoken with Daniel and Ruth Lepke. *Id.* The summaries purportedly identify all of defendants' interstate deliveries during the relevant time period, by category (i.e., "2012 Smart Sand Shipments," "2012 Interstate Trips," "River Sand 2012," etc.). The summaries implicitly include defense counsel's assessment that the deliveries qualify as interstate travel.[1]

Defendants' proposed findings of fact do not cite admissible evidence; they cite defense counsel's declaration, in which he asks the court to accept his understanding of the facts without providing the underlying evidence. *Id.* ¶ 8. Defendants attempted to cure the problem by re-offering the information via Daniel Lepke, presumably someone with actual personal knowledge of the declaration's contents and attachments. *Compare* Dkt. 77 *with* Dkt. 89.

---

[1] The record includes several Daily Hired Truck Reports (i.e., the source documents for the summary charts). The reports allegedly document defendants' projects and affiliated travel. But the reports do not explicitly state where employees traveled for a given assignment; the reports merely log the job number or delivery locations by name. *See, e.g.,* Dkt. 86-1 (reports log delivery locations as "to Brennan," "Onalaska Spillway," "Stoddard," and "Antonio"). So in creating the summary charts, defendants did not simply *compile* information; they *interpreted* it.

According to defense counsel, in June 2016, as defendants prepared their summary judgment submissions, Daniel Lepke was in Mexico receiving treatment for terminal pancreatic cancer. Defense counsel explains that, to "keep the case on schedule," he chose to offer documents and a "good faith statement of counsel summarizing what he believed Mr. Lepke's testimony would be if he were available to provide it" in support of defendants' proposed findings of fact. Dkt. 97, at 2. Although the court understands that defendants were in a difficult position, counsel's decision was unwise. Counsel offered "evidence" outside of his personal knowledge. By counsel's own admission, Daniel Lepke "was not in any condition to read, understand or approve any testimony when the defendants' Motion for Summary judgment on the § 213(b)(1) Motor Carrier Exemption came due on June 30, 2016." *Id.* at 1-2. If so, defendants should not have moved forward. The court will also point out that the unfortunate coincidence of Lepke's unavailability with the summary judgment deadline was a problem of defendants' own making: rather than take care of their submissions when Lepke was available, defendants requested an extension of the filing deadline, from May 10, 2016, to June 30, 2016. Dkt. 71 and Dkt. 74.

But none of that changes the fact that defendants have not filed any properly supported proposed findings of fact. In addition to being procedurally improper, defendants' choices have created a less-than-clear factual record; the court is able to pick very few—if any—undisputed, supported facts from the parties' submissions. As a result, defendants' motion for summary judgment is unsupported. Because defendants have the burden to adduce evidence that, unless contradicted, would entitled them to judgment as a matter of

law, their failure to comply with the court's procedures is fatal, and the court will summarily deny the motion.[2]

## A. Plaintiffs' motion to strike

Even if the court were to overlook defendants' failure to comply with the summary judgment procedures, the court still would not consider Daniel Lepke's declaration. Dkt. 89.[3] For the court to consider Lepke's declaration at summary judgment, it must be possible to put the information into an admissible form for trial. 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.91[2] (3d ed. 2015) ("[T]he party submitting the material must be able to demonstrate how it will be possible to introduce the content or substance of the material at trial."). Here, unfortunately, since submitting his declaration, Daniel Lepke has passed away. So he cannot testify at trial. Defendants have not shown that Lepke's declaration, or the information it offers, would be admissible at trial without him. Defendants do not indicate that they would be able to offer the travel summaries or other evidence through any other witnesses. The court would strike the Daniel Lepke declaration and its attachments.

---

[2] *See Abraham v. Wash. Grp. Int'l, Inc.*, 766 F.3d 735, 737 (7th Cir. 2014) ("[T]his Circuit has routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions, including the precise local rule at issue here."); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 630-31 (7th Cir. 2010) (holding that the district court did not err when it deemed the defendant's proposed findings of fact admitted and refused to consider additional facts for the plaintiff's failure to follow the local procedures on proposed findings of fact).

[3] The court would not strike William Lepke's declaration. Dkt. 90. Defendants filed the declaration to dispute plaintiffs' proposed findings of fact. *See* Dkt. 92. Nor would the court strike any allegedly "new" arguments from defendants' reply brief. Arguments raised for the first time in a reply brief are generally waived, but the court would alleviate any potential prejudice to plaintiffs by accepting their surreply brief in opposition to the motion for summary judgment. Dkt. 95-1.

B.  **Summary judgment**

Defendants' procedural failings aside, the court would still deny the motion for summary judgment.

The court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.*

Defendants bear the burden of proof here; defendants must have adduced evidence that establishes, as a matter of law, that plaintiffs were exempt from FLSA overtime pay during the relevant time period. *See Johnson*, 651 F.3d at 660. Courts construe FLSA exemptions narrowly and against employers. *Id.*

Had defendants complied with the court's summary judgment procedures, the court could conclude that defendants' drivers performed numerous interstate trips during the relevant time period. Even so, defendants have not demonstrated that they are entitled to judgment as a matter of law because the record is littered with genuine disputes of material fact. Other than the conceded interstate trips that the Schlichts and Connelly made, defendants have not demonstrated that plaintiffs drove interstate routes. As discussed above, the parties fervently debate whether certain trips qualified as interstate—as opposed to intrastate—travel. Plaintiffs have adduced evidence that calls into question the nature of their allegedly "interstate" trips. The record reflects genuine disputes of material fact regarding the

nature of the Oakdale facility deliveries; the Lock & Dam #7 trips; the trips to La Crescent versus French Island; the trips involving the Lansing pit; the barge deliveries; and the trips between Brownsville, Minnesota, and the Minnesota side of the I-90 bridge project. The bottom line is that defendants have created a messy, largely challenged record, and plaintiffs have adduced evidence that raises credibility concerns regarding the accuracy of defendants' summaries. Defendants have not demonstrated, as a matter of law, that plaintiffs made sufficient interstate trips to exempt them for the entire period in question.

Defendants concede that they have not made the best case for plaintiffs' routes. But they contend that they have adduced evidence of interstate trips by other drivers. Defendants contend that this evidence is sufficient to demonstrate that plaintiffs had a reasonable expectation of performing interstate work during the relevant time period. But the record reveals genuine disputes of material fact with respect to this issue, too. A number of the interstate trips that defendants have identified appear to have involved transporting equipment and heavy machinery, and plaintiffs have adduced at least some evidence that they were never in a position to perform those types of deliveries. For example, plaintiffs state that work on intrastate crews often precluded them from accepting additional work for periods of time. More importantly, defendants have not adduced any evidence that interstate work assignments were mandatory, distributed generally, or shared indiscriminately; thus, defendants have not adduced evidence sufficient to establish that plaintiffs had a more-than-remote chance of being assigned interstate work during the relevant time period. *See, e.g.*, *Solis v. R.M. Int'l, Inc.*, No. 3:09-cv-863, 2012 WL 912942, at *5 (D. Or. Mar. 16, 2012) ("Because the overwhelming evidence at trial proved that Defendants' policy was only to seek volunteers for trips made in interstate commerce, the Court concludes the possibility of being

*required* to drive in interstate commerce was so remote that Defendants' drivers did not have a reasonable expectation that they would be required to do so."). The court could not grant defendants' motion on this record.

## C.  Daniel Lepke

One final note: it has been more than 90 days since the parties noted Daniel Lepke's death on the record. Under Federal Rule of Civil Procedure 25, the parties had 90 days to move to substitute the proper party. Because no party has moved to substitute, the court must dismiss plaintiffs' claims against Lepke.

ORDER

IT IS ORDERED that:

1. Defendants Dan Lepke Trucking LLC, Lepke Trucking & Excavating LLC, and Daniel Lepke's motion for summary judgment, Dkt. 75, is DENIED.

2. Plaintiffs Timothy Connelly, David Winchell, Raymond Schlicht, and Rodney Schlicht's motion to strike, Dkt. 95, is DENIED as moot.

3. Defendants' motion for leave to respond to plaintiffs' contention that the court should disregard the Daniel Lepke declaration, Dkt. 100, is GRANTED.

4. Plaintiffs' claims against defendant Daniel Lepke are DISMISSED, pursuant to Federal Rule of Civil Procedure 25.

5. The court will hold a telephonic status conference to reset all remaining deadlines in this case on Friday, January 13, 2017, at 10:00 a.m., before Magistrate Judge Stephen L. Crocker. Plaintiffs' counsel is responsible for setting up the call to chambers at (608) 264-5153.

Entered January 6, 2017.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge