## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

**Timothy Connelly, et al.**

**On Behalf of Themselves and
All Others Sharing a Question of
Common Interest**

      **Plaintiffs**

      **v.**                                         **Case No. 15-CV-308**

**Dan Lepke Trucking LLC
Lepke Trucking & Excavating LLC**

      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF THE
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiffs are entitled to summary judgment as to liability, with respect to both their FLSA and Wisconsin law claims. Each Plaintiff was not covered by the motor carrier exemption during at least a portion of their employment with the Defendants when they did not perform any interstate assignments during the preceding four months, and when following Daniel Lepke's death the Defendants have no way to show that there was more than a remote chance that Daniel Lepke would have offered an interstate driving assignment to the Plaintiffs, which as a matter of historical fact was never offered to, or performed by the Plaintiffs. With respect to these non-exempt time periods, the Defendants violated the FLSA by paying the Plaintiffs straight time pay for more than 40 hours worked, and by failing to count the Plaintiffs' pre-load and post-unload work activities as hours worked, which if done would have entitled to the Plaintiffs to additional overtime pay.

The Plaintiffs' pre-load and post-unload work hours constitute hours worked under Wisconsin law as well. The Defendants violated Wisconsin law, specifically DWD §272.12(1)(a) and Wis. Stat. §103.02, when it failed to pay to the plaintiffs separate hourly pay for their pre-load and post-unload work hours.

The Defendants additionally violated Wisconsin prevailing wage overtime law by failing to pay overtime pay to the Plaintiffs when they worked more than 10 hours per day or 40 hours per week, but fewer than 10 hours per day or 40 hours per week on prevailing wage projects. The Defendants also agreed to provide weekly overtime pay to the Plaintiffs even during time periods when they were covered by the motor carrier exemption. To the extent the overtime agreement authorized excluding pre-load and post-unload work hours from the determination of hours worked, the exclusion is unlawful as applied to prevailing wage projects, so that it cannot be applied to non-prevailing wage projects either. The Defendants' violated the lawful and enforceable portion of the overtime pay agreement, and thereby Wis. Stat. §109.03(1), by excluding pre-load and post-unload work hours when computing contractual overtime pay.

Finally, the Defendants deducted $4,138 from Timothy Connelly for his involvement in a truck accident without complying with the authorization procedures set out in Wis. Stat. §103.455, thus entitling Connelly to statutory double damages of $8,276.

## ARGUMENT

I.  <u>The Defendants' Method of Computing the Plaintiffs' Hours Worked Violated the FLSA, because the Plaintiffs Were not Always Covered by the Motor Carrier Exemption.</u>

The Fair Labor Standards Act applies to hours worked on state prevailing wage projects. *Sobczak v. AWL Indus.*, 540 F. Supp. 2d 354, 360-361 (E.D. N.Y. 2007) (Employer must comply with higher requirement between FLSA and state Wisconsin prevailing wage laws when work was

subject to both requirements). Under the plain language of 29 U.S.C. §207(a), the Plaintiffs cannot be paid at the straight time pay rate for more than 40 hours per week, during workweeks when they were not covered by the motor carrier exemption.

There are substantial factual disputes between the parties as to whether the Plaintiffs actually moved across state lines, or participated in an interstate movement of goods, on certain assignments that the Defendants claim to be interstate driving assignments. Even if all these factual disputes are resolved in the Defendants' favor, Connelly was non-exempt in June of 2013, the Schlichts were non-exempt after July 18, 2014, while Erlandson was never exempt because (a) None of them performed any actual interstate work during the four months preceding the pay period in question; (b) The Defendants cannot demonstrate that any of the Plaintiffs had more than a remote chance of being offered an interstate driving assignment that they did not perform; and (c) the Schlichts and Erlandson in particular did not have more than a remote chance of being offered to work on the Ames I-90 Project, the only interstate project available for the Defendants' drivers during 2014 and 2015. The Defendants paid more than 40 hours of straight time pay to Timothy Connelly for the workweek of June 22-28, 2013, to Raymond Schlicht for the workweek of July 26-August 1, 2014, to Rodney Schlicht for the workweek of July 19th – 25th, 2014, and to Scott Erlandson for the workweek of April 26-May 2, 2015. (PFOF ¶3) In each instance the failure to pay overtime pay violated §207 of the FLSA, so long as the Plaintiff was not covered by the motor carrier exemption when the overtime hours were worked.

a.     <u>None of the Plaintiffs Performed Any Actual Interstate Assignments During the Four Months Preceding the Pay Period When They Were Deprived of Overtime Pay</u>.

That a driver was involved in, or was subject to be used in interstate commerce subjects him to the motor carrier exemption for the following four months, rather than indefinitely. *Johnson*

*v. Hix Wrecker Service*, 651 F. 3d 658, 661 (7th Cir. 2011); Docket #102, pg. 3.  Nor is there anything inconsistent between applying the four months rule, and the Seventh Circuit's teaching in *Collins v. Heritage Wine Cellars*, 589 F. 3d 895, 900 (7th Cir. 2009), that a driver should not simultaneously be both exempt when driving large vehicles, and non-exempt when driving small vehicles.  In contrast, under the four months rule at any given time a driver is either 100% exempt, or 100% non-exempt; and cannot be simultaneously both exempt and non-exempt.

The Defendants concede during their deposition that Scott Erlandson never drove outside the State of Wisconsin for them.  (PFOF ¶4) The Defendants also do not list any interstate driving assignments performed by the Schlichts after March 18, 2014.  (PFOF ¶5) When previewing the evidence that they may present for a trial on the applicability of the motor carrier exemption, the Defendants similarly did not claim that they had additional evidence showing the Schlichts performed interstate work after March 18, 2014.  (PFOF ¶6) Because their last interstate driving assignments were dated March 18th, Rodney Schlicht did not perform any interstate driving assignments during the four months preceding the workweek of July 19th -25[th], 2014, while Raymond Schlicht did not perform any interstate driving assignments during the four months preceding the workweek of July 26th – August 1th, 2014.

The only interstate driving assignments that the Defendants claim Timothy Connelly performed, before November of 2013 when he began to work on the Ames I-90 project, consist of sand hauls from a sand pit to either Genoa, Wisconsin, or Chaseburg, Wisconsin.  (PFOF ¶7) Connelly would pick up the sand from a sandpit located across the final stretch of river from Lansing, Iowa; so that the sandpit was located in Wisconsin if the final stretch of the river between Wisconsin and Lansing, Iowa is the border between Wisconsin and Iowa. (PFOF ¶8) In fact, as shown by the attached map from Google Maps, the border between Wisconsin and Iowa is in the

middle of the final stretch of the Mississippi River dividing Lansing, Iowa from the land across from Lansing, Iowa. (PFOF ¶9) Connelly therefore picked up the sand in Wisconsin, and delivered the sand to other locations within Wisconsin.  The Defendants, rather than claim Connelly actually picked up the sand in Iowa, instead argued that the U.S. Army Corps of Engineers dredged up the sand on the Iowa side of the border, before depositing said sand (in Wisconsin) in the sand pit from which Connelly made the sand pickups.  (PFOF ¶10)

However, even under the Defendants' account there was a change in the sand's ownership after it was deposited into the sandpit.  Specifically, the Defendants admit that both themselves and others were permitted to pick up the sand from the sandpit without cost.  (PFOF ¶11) The Defendants cannot be said to have owned the sand when it was dredged up from the river and deposited into the sandpit, given that anyone was able to pick up said sand from the sandpit. The sand's ownership can best be described as follows:  It was owned by the U.S. Corp. of Engineers when it was dredged up, owned by no one once deposited into the sandpit, and owned by the Defendants after their trucks picked up the sand.  The Defendants therefore did not acquire ownership of the sand delivered by Connelly until after it was deposited into the sandpit by the U.S. Army Corps. of Engineers.

This case is perfectly analogous to the second example discussed in *Collins*, in which Heritage shipped the wine into Illinois, title to the wine passed to the distributor upon arrival at the warehouse, and the distributor then made intrastate shipments of the wine.  See 589 F. 3d at 897. The change in ownership of the sand after its arrival in Wisconsin interrupts the interstate journey of the sand, just like the *Collins* Court found that the change in ownership of the wine after its arrival in Illinois interrupted its interstate journey, so that the distributor's subsequent intrastate shipments of the wine should be classified as an intrastate shipment.  *See also Wirtz v. Lunsford*,

404 F. 2d 693, 697 (6th Cir. 1968) (Whether there was a continuous movement of goods depends on whether the intrastate shipper took ownership of the product after its arrival in the destination state).  Connelly made an intrastate shipment, rather than the final leg of a continuous interstate movement, by moving sand from a sandpit located in Wisconsin to other locations within Wisconsin.

> b.   <u>The Defendants Cannot Rely on Interstate Driving Assignments that the Plaintiffs Were Never Offered to Demonstrate that They were Subject to the Motor Carrier Exemption</u>.

When the carrier claims the exemption applies to a driver who has not engaged in interstate commerce (within the preceding four months, given the applicability of the four months rule), it must show the driver could reasonably have been expected to make one of the carrier's interstate runs.  *Johnson*, 658 F. 3d at 661.  Employers are not permitted to circumvent the maximum hours provisions of the FLSA by claiming that their employees are used in interstate commerce even when the likelihood of an employee being sent on an interstate run is remote.  *Johnson*, 658 F. 3d at 663.  A driver who does not have a more than remote chance of being used in interstate commerce is not subject to the motor carrier exemption, though other drivers employed by the same carrier regularly made interstate trips.  *Goldberg v. Faber Industries Inc*., 291 F. 2d 232, 235 (7th Cir. 1961) Treating the drivers as a group instead to determine applicability of the motor carrier exemption requires showing that driving assignments were handed out indiscriminately, and that the carrier required its drivers to accept said assignments; so that each and every driver had more than a remote chance of receiving each and every interstate driving assignment.  See for example *Resch v. Kraft Coaches*, 785 F. 3d 769, 784 (3rd Cir. 2015).

The Defendants in contrast did not offer driving assignments randomly, and did not require any driver to accept any driving assignment.   Daniel Lepke considered criteria such as the

individual drivers' familiarity with the customer foremen and the area, the driver's capabilities, and the amount of liability involved in the driving assignment when deciding which drivers to offer which assignments to; and never forced any driver to accept any particular work assignment. (PFOF ¶12) He also never forced any driver to accept any driving assignment.  (PFOF ¶13)

Because driving assignments are not distributed on a random basis, whether a driver had more than a remote chance of being used in interstate commerce must be analyzed driver by driver, rather than for the entire driver pool.  Following Daniel Lepke's death (PFOF ¶14) the Defendants have no way to reconstruct his thought processes, to demonstrate that any of the Plaintiffs had more than a remote chance of being offered a driving assignment, which as a matter of historical fact was never offered to them.  The Defendants therefore cannot meet their burden of proof, to show that the Plaintiffs had more than a remote chance of performing interstate driving assignments that they in fact did not perform.  The Court should therefore rule, as a matter of law, that the Defendants can only rely upon driving assignments that the Plaintiffs actually performed to demonstrate the applicability of the motor carrier exemption.  The Plaintiffs therefore were non-exempt during the during the workweek of June 22-28, 2013 for Connelly, the workweek of July 25-July 31, 2014 for Raymond Schlicht, the workweek of July 19-25, 2014 for Rodney Schlicht, and the workweek of April 26-May 2, 2015 for Erlandson.

  c.    The Schlichts and Erlandson Were Not Exempt When They Declined to Perform the Only Available Interstate Assignment.

 The Defendants do not claim to have performed interstate driving assignments for anyone other than Ames Construction during the years of 2014 and 2015.  (PFOF ¶15) Daniel Lepke permitted as many drivers as wanted to go to work at the Ames project, so that he never forced anyone to work on the project, and never forceably took anyone off the project.  (PFOF ¶16) More specifically, the Schlichts did not work on the Ames project after March 18, 2014 because they

told Daniel Lepke that they no longer wished to work the number of hours that were required by Ames. (PFOF ¶17) Similarly, Erlandson specifically told Daniel Lepke that he did not want to go up and perform work at the Ames Project. (PFOF ¶18)

The Schlichts and Connelly clearly did not have more than a remote chance of working on the Ames project, during time periods when they specifically told Daniel Lepke that they would not work on the project, given that Daniel Lepke would never force any driver to work on any project. Since the Defendants did not have any other interstate driving assignments available in 2014 and 2015 aside from the Ames project, the Schlichts did not have more than a remote chance of being used in interstate commerce after March 18, 2014; while Erlandson did not have more than a remote chance of being used in interstate commerce throughout his 2015 employment with the Defendants. The Schlichts therefore were overtime pay eligible by mid-July of 2014; while Erlandson was overtime eligible throughout his entire period of employment; even if the Court declines to rule more broadly that the Defendants can only rely upon driving assignments actually performed to demonstrate the applicability of the motor carrier exemption.

II.    The Defendants Violated the FLSA in the Manner that it Computed the Plaintiffs' Hours Worked.

The Defendants maintained a uniform policy of paying their drivers only for the hours, for which they received payment from their customers. (PFOF ¶19) In a letter she provided to drivers of Dan Lepke Trucking, Ruth Lepke explained this policy as: "Start AM is when the truck is loaded. Stop PM is when the truck is unloaded". (PFOF ¶20) Complying with this policy, the Plaintiffs did not write down on their time cards their hours worked before their trucks were loaded for the first time on the day, and after their trucks were unloaded for the final time on the day. (PFOF ¶21) Work activities the Plaintiffs performed, which time they did not write down on their time cards, included time spent learning their work assignments, warming up their trucks,

performing pre-trip inspections, driving to the first loading site for the day, waiting at the first loading site to be loaded, driving from the final unloading site back to the shop, fueling trucks, performing a post-trip inspection of the trucks, and completing paperwork.  (PFOF ¶22) In response to the Plaintiffs' Complaint, the Defendants did not deny that many of the Plaintiffs' work activities, for which they did not receive separate hourly compensation, were integral to their principle activities and/or compensable.  (PFOF ¶23)

Under the FLSA, time spent performing activities for one's employer must count as time worked, if the activities were integral and indispensable to the employee's performance of principal activities, in this case the driving of dump trucks to deliver materials. *IBP Inc. v. Alvarez*, 546 U.S. 21, 29-30 (2005).  Activity is integral and indispensable if it is an intrinsic part of principal activities, and one without which the principal activity cannot be performed. *Integrity Staffing Solutions v. Busk*, 135 S. Ct. 513, 518 (2014).

In this case, even if the Defendants' admissions are not dispositive, the Plaintiffs' work before their trucks were loaded for the first time on the day were clearly integral and indispensable to their dump truck driving work:  The Plaintiffs could not work for the Defendants without learning their work assignments.  The Plaintiffs could not reliably and safely operate their dump trucks without performing a pre-trip inspection, and warming them up.  The Plaintiffs had no way to deliver materials from the pickup location to the drop off location without first moving their dump trucks to the pickup location, and without waiting in line for their trucks to be loaded. Similarly, the Plaintiffs' post-trip activities such as fueling their vehicles and returning their dump trucks to the storage location were integral and indispensable to enable them to use their dump trucks the next day. Similarly, the Defendants used time records completed by the Plaintiffs to bill their customers accurately for the Plaintiffs' work, and/or to keep track of the work performed by,

and the mileage driven by the Plaintiffs. (PFOF ¶24) The completion of paperwork was thus similarly integral and indispensable to the Defendants receiving accurate payment for the Plaintiffs' work; and therefore was integral and indispensable to the Plaintiffs' work.

The Defendants credited as having worked more than 40 hours during the workweek Timothy Connelly during the workweek of June 22-28, 2013, Raymond Schlicht during the workweek of July 26-August 1, 2014, Rodney Schlicht during the workweek of July 19th – 25th, 2014, and Scott Erlandson during the workweek of April 26-May 2, 2015. (PFOF ¶25) During these workweeks the Plaintiffs' work time before the first loading, and after the final unloading were not counted as hours worked. (PFOF ¶19-22) For the reasons explained in Section I above, none of the men were covered by the motor carrier exemption during these workweeks. Counting their pre-load and post-unload work hours as time worked would have increased their work hours, and thereby increased their eligibility for overtime pay. The Defendants' failure to count these pre-load and post-unload activities as time worked during time periods when the Plaintiffs were eligible for statutory overtime pay violated the FLSA.

III.    Under Wisconsin Law, the Plaintiffs are Entitled to Additional Straight
        Time Hourly Pay For Each of Their Unpaid Hours Worked.

Under Wisconsin law, work time must be paid if spent in physical or mental exertion controlled or required by the employer, and pursued necessarily and primarily for the employer's benefit. DWD §272.12(1)(a). The Plaintiffs' pre-load and post-unload work activities are compensable under Wisconsin law for similar reasons as why they must count as time worked under the FLSA: Work activities integral to the Plaintiffs' ability to perform their principal activities for the Defendants clearly constitute physical exertion required by the Defendants, which were pursued necessarily and primarily for the Defendants' benefit. Indeed, as stated in the Defendants' answer, their main defense is that the Plaintiffs have been fully compensated despite

not receiving separate hourly pay for their pre-load and post-unload work hours; rather than that the Plaintiffs' pre-load and post-unload work hours should not count as time worked.

The Defendants' argument that the Plaintiffs can be fully compensated for work hours, for which they received no separate hourly pay, is based upon the erroneous assumption that it can comply with Wisconsin law so long as during each week the Plaintiffs received on average the minimum wage. Paying the plaintiffs nothing for some of their hours worked directly violates DWD §272.12(1)(a), which requires for employees to be paid for all hours worked; and Wis. Stat. §103.02, which sets the employees' regular rate as the minimum rate of pay.  Alternatively, Wis. Stat. §109.03(1) prohibits counting wages paid for one hour as compensation for a different, unpaid hour worked, so that paying the Plaintiffs $0 per hour for some of their hours worked violates DWD §272.12(1)(a), even if §272.12(1)(a) is erroneously read to authorize payment for hours worked at the minimum wage rather than the established regular rate.

    a.    <u>The Plaintiffs are Entitled to Their Full Wage Rate for All Work Hours</u>.

The Wisconsin legislature authorized the Wisconsin Department of Workforce Development to divide employees' work hours into those to be paid at regular rates, and those to be paid at 1.5 times said regular rates.  Wis. Stat. §103.02.  At all relevant times the Plaintiffs had established regular rates well above the minimum wage.  In the records before the Court, the Plaintiffs received at least $12 or $15 per hour for their credited hours worked.  (Docket #106-1- #106-4).

Pursuant to authority granted by Wis. Stat. §103.02, the DWD promulgated DWD §274.02(3) requiring payment for on-duty meal breaks.  German v. Wisconsin DOT, 2000 WI 62 ¶10, 235 Wis. 2d 576.  The Wisconsin Supreme Court thus interpreted §103.02 as authorizing the DWD to promulgate regulations that require employees to be paid for their hours worked.

Moreover, the DWD in promulgating regulations addressing employee compensation recognized a distinction between paying for, and counting the hours worked. Therefore DWD §274.02(3) separately provides that employers must pay their employees for their on-duty meal breaks, and that the time spent on on-duty meal breaks are to be counted as work time. Another illustration of the same principle is that Wisconsin law requires apprentices be paid for related instruction, but provides that time spent in related classroom instruction by indentured apprentices need not count as work time. §106.01(6)(a); DWD §272.12(2)(f)5.

DWD §272.12(1)(a) provides that employees must be paid for all time spent in physical or mental exertion controlled or required by the employer, which are pursued necessarily and primarily for the employer's benefit. §272.12(1)(a) explicitly uses the term "paid", while much of the remainder of §272.12 states that time spent performing certain activities must be counted as work time, and while Wisconsin wage regulations clearly recognize the distinction between paying for time worked, and counting time worked as work time. The Court should give effect to the plain language of §272.12(1)(a) to find that Wisconsin law requires for employees to be paid for each and every hour worked. Moreover, because DWD §272.12(1)(a) was promulgated pursuant to the DWD's authority under Wis. Stat. §103.02, see by analogy *German*, 2000 WI 62 ¶10, it should be given a meaning consistent with §103.02: When §272.12(1)(a) states that employees must be paid for their hours worked, the payment must be using the employees' regular rates, unless the DWD pursuant to separate regulation has defined the hours worked as ones to be paid at 1.5 times the employee's regular rate. Because the Defendants have not defined the minimum wage as the regular rate of pay for any of the Plaintiffs, the Plaintiffs must receive their regular rates rather than the minimum wage for each and every one of their hours worked. A scenario in which the Plaintiffs received the full regular rate for their work between the first loading and the

final unloading on the day, but no separate wages at all for their other hours worked therefore constitutes a direct violation of Wis. Stat. §103.02 and DWD §272.12(1)(a).

b.    FLSA Style Averaging to Comply With Minimum Wage Requirements is Prohibited by Wis. Stat. §109.03(1).

The same result of a violation follows, if the Court erroneously interprets DWD §272.12(1)(a) to require that the Plaintiffs receive the minimum wage, rather than the full established rate of pay, for each of their work hours.   Even under that interpretation of §272.12(1)(a), the full wage payment guarantee of Wis. Stat. §109.03(1) (a provision without a parallel in the FLSA) prohibits the Defendants from counting wages originally paid for one hour worked as compensation for a different unpaid hour worked, resulting in the Plaintiffs receiving wages at the rate of $0 per hour rather than the minimum wage for their unpaid hours worked.

Under the minimum wage provisions of the Fair Labor Standards Act, employees are entitled to the minimum wage of $7.25 per hour for each and every hour they work.  *DeKeyser v. Thyssenkrupp Waupaca Inc*., 735 F. 3d 568, 570 (7th Cir. 2013); *Stein v. HHGregg Inc*., 873 F. 3d 523, 536 (6th Cir. 2017).  Because FLSA minimum wage compliance is determined on a week to week basis, an employee who receives no wages for some of his hours worked has nonetheless received the legally required minimum wage, if he received on average at least the minimum wage throughout the workweek.  *U.S. v. Klinghoffer Bros. Realty Corp*., 285 F. 2d 487, 490 (2nd Cir. 1960).  Because the minimum wage must be paid for every hour worked, the *Klinghoffer* rule is necessarily based upon the principle that when an employer pays for some of its employees' hours worked at rates above the minimum rate, the portion of the wage payment above the minimum can be reclassified, and counted as compensation for the employees' other, originally unpaid hours worked.  The reclassification results in the employee receiving a wage rate below the full wage rate promised to him, but at or above the minimum wage for his paid hours worked; and a wage

rate equal to the minimum wage for his originally unpaid hours worked. Such reclassification does not violate the FLSA because for each hour worked the employee must receive the minimum wage, rather than the full wage promised to him.

In contrast, such reclassification is prohibited by Wisconsin law, specifically Wis. Stat. §109.03(1). Under Wis. Stat. §109.03(1), each employee must receive all wages he earned no more than 31 days after the performance of the work to earn the wage. §109.03(1) is a full wage payment guarantee, rather than a provision that only addresses the timing of wage payments. *German v. Wisconsin DOT*, 2000 WI 62 ¶29. (Employee can maintain claim under §109.03 when he has received a(n incorrect) paycheck, but is seeking the full amount of wages due to him). Under §109.03(5), the enforcement mechanism for §109.03(1), employees may recover wages that had been promised to them, though they had already received wage payments well above the minimum wage. *Lynch v. Crossroads Counseling Center*, 2004 WI App 114 ¶20, 27, 35-45; 275 Wis. 2d 171 (Employee who was paid $15 rather than the $30 per hour promised to him by contract is entitled to attorneys' fees under §109.03(6)); *Jacobson v. American Tool Co. Inc*., 222 Wis. 2d 384 (Ct. App. 1998) (Chief executive officer entitled to recover pay for stock appreciation rights as provided by his employment package).

Under §109.01(3), wages include remuneration for personal services which the employer agreed to pay either by agreement or custom. Once an employer establishes a rate of pay for the employee, full wage payment required by Wis. Stat. §109.03(1) requires paying to the employee the full, established rate for each and every hour worked. Moreover, no provision of §109.03 authorizes determining whether an employee has received the full amount of wages owed to him on anything longer than an hour by hour basis. Because §109.03(1) requires for the employee to receive the full established wage rate for his paid hours worked, none of the compensation received

by the employee can be reclassified, and counted as compensation for the employee's other, originally unpaid hours worked. Even if DWD §272.12(1)(a) is treated as a minimum wage requirement rather than a full wage payment guarantee, the Defendants still violated DWD §272.12(1)(a) by paying for the Plaintiffs' pre-load and post-unload work hours at a rate of $0 per hour rather than the minimum wage of $7.25 per hour.

    c.    <u>The Defendants Cannot Rely on a DWD Decision to Secure Exemption from the Plain Requirements of DWD §272.12(1)(a).</u>

To the extent the Defendants rely on the DWD's decision in *Jacobson et al. v. Fischbach Trucking Inc.*, to support its position, the Court should not defer to an agency's interpretation of a regulation to the extent that it is inconsistent with the regulation and/or plainly erroneous. *Wisconsin Dep't of Revenue v. Menasha Corp.*, 2008 WI 88 ¶45, 311 Wis. 2d 579. As the Wisconsin Supreme Court has recognized:

> An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down…Such deviations cannot be reconciled with the fundamental principle that ours is a government of laws, not men.

*Waste Management Inc. v. Wisconsin Solid Waste Recycling Authority*, 84 Wis. 2d 462, 477 n. 4 (1978). Indeed, the process of having the legislature approve agency rules (see Wis. Stat. §227.19) would be meaningless if the agency can wholly disregard regulations approved by the legislature in its decision making. Similarly, the DWD's section chief in Fischbach found that an employer need not pay at least the minimum wage for every one of its employees' hours worked unless it agreed to do so. Docket #118-7, pg. 2. This holding violates the plain language of DWD §272.12(1)(a), which requires for all work time to be paid so long as the time is defined as compensable work time by Wisconsin law, rather than by private agreement. The DWD's decision making in violation of its own regulations cannot stand, but instead must be stricken down.

Indeed, the DWD's decision in Fischbach is internally inconsistent:  It attempts on one hand to apply the *Klinghoffer* rule, while recognizing on the other hand that an employee who was promised a wage rate of $18 per hour cannot be paid at a wage rate of $12 per hour instead. (Docket #118-7, pg. 3) Reclassifying a portion of the $18 per hour for some of the hours worked by the employee as compensation for other, unpaid hours worked violates Wisconsin law that requires for employees to receive the full, promised $18 per hour for his paid hours worked. The employee consequently has received a wage rate of $0 per hour for some of his hours worked, a result that violates DWD §272.12(1)(a), a regulation that the DWD must follow but instead entirely ignores.

Indeed, the Wisconsin Supreme Court has held that the wage claims of a group of Hormel Foods employees are not de minimus because they on average had 24 unpaid hours per year, and had an average wage rate of $22 per hour, so that the total wages owed to them in excess of $500 was not de minimus.  *UFCW Local 1473 v. Hormel Foods*, 2006 WI 13 ¶102; 367 Wis. 2d 131. For 24 unpaid hours and $22 per hour straight time pay equal $528, full overtime pay (as 1.5 times the regular rate) would be $792, while overtime premium pay would be $264.    Regardless of what the underlying claims asserted in the lawsuit were, the Wisconsin Supreme Court has held the employees' wage claims are not de minimus, because they are entitled to more than $500 in straight time pay for their 24 unpaid work hours per year.  This holding provides further support the Plaintiffs' position, based on the plain language of Wisconsin statutes and regulations, that they are entitled to additional compensation at their regular rates of pay for unpaid work hours.

IV. <u>Hours Worked on Both Prevailing Wage and Non-Prevailing Wage Hours should be Counted When Determining Eligibility for Prevailing Wage Overtime Pay</u>.

The Plaintiffs did not always receive overtime pay when they worked on a prevailing wage project, after they had already worked for 40 hours during the workweek.  For example, during the

week ending July 12, 2013 during hours 41-61 Connelly worked on the prevailing wage Highway 35 and Highway 131 Projects.  (PFOF ¶26) Connelly received daily prevailing wage overtime pay for the final 4.5 hours worked on Tuesday, the final 2.5 hours worked on Thursday, but did not receive any weekly prevailing wage overtime pay. (PFOF ¶27) On the other hand, when the Plaintiffs only worked on non-prevailing wage projects, they received overtime pay whenever they worked more than 40 hours during the week. (PFOF ¶28) The Defendants therefore paid overtime pay to the Plaintiffs only if they worked more than 40 hours of non-prevailing wage work, or more than 40 hours of prevailing wage work (after offsetting one hour of paid daily prevailing wage overtime for every hour of owed weekly prevailing wage overtime).

Wisconsin prevailing wage laws define the prevailing hours of labor as those hours exceeding 10 hours per day, 40 hours per week, or worked on designated holidays.  Wis. Stat. §103.49(1)(c).[1]   Overtime wages are due when the employee performs work in excess of the prevailing hours of labor per day or per week.  DWD §290.05.  Each of the prevailing wage statutes similarly require the payment of overtime pay when workers work beyond the prevailing hours of labor, without specifying whether non-prevailing wage work hours must count when determining whether a worker has worked beyond the prevailing hours of labor.  Wis. Stat. §66.0903(4)(a); §103.49(2m); §103.50(2m)(b).

The ambiguity in the statute can be removed by applying the intent of Wisconsin's prevailing wage laws to have prevailing wages mirror wages received by employees on comparable private employment:  Employees should receive, for their work on prevailing wage projects, a wage rate received for the majority of hours worked in a trade or occupation on private

---

[1] The statutes cited by this section of the brief have been repealed in material part, and each refer to the versions of the statutes that were in effect when the Plaintiffs performed work for the Defendants.

projects in the same area.  Wis. Stat. §66.0903(4)(a).  As the DWD further explained in a publication:

> (Prevailing wage laws) mandated that most workers employed on public works projects must receive wages which are representative of the wages normally paid to workers on similar private projects in an area.  Employers were required to base their bids on prudent planning, good management and supervision and the skill and efficiency of their workers and not solely on the wages paid to their workers.

Ho Dec. Ex. 4.   The whole purpose of the prevailing wage laws is thus to negate the advantage of the contractor who is not paying area standard wages over the contractor who is paying area standard wages.  Prevailing wage laws achieve this goal by requiring all contractors to pay to their employees at least the same wage rates as those paid by contractors paying area standard wages. Legally required prevailing wages therefore should mirror what is paid on private projects for the same trade or classification, and within the same geographical area.

Overtime pay is a significant part of area standard wages, by setting wages that must be paid for the contractors' employees' overtime hours worked.  The regulations explicitly express this intent to even the playing field with respect to the payment of overtime pay, by requiring overtime pay whenever an employee worked beyond the prevailing hours of labor, i.e. hours that would be paid at overtime rates if worked on private projects in the same trade, and within the same work area.  On private projects, employers must pay overtime pay whenever an employee worked more than 40 hours during a workweek.  DWD §274.03.  DWD §274.04, which contains a long list of full and partial exemptions from §274.03, does not contain one that would authorize employers to separately keep track of hours worked on each project to determine overtime pay eligibility. See by analogy 29 U.S.C. §207(a), (g)(2) (Employees who performed more than one type of work during the workweek nonetheless must receive overtime pay whenever working more than 40 hours during the workweek).  The Defendants followed the same correct rule of combining

hours worked on multiple projects when computing overtime pay eligibility.  For example, for the week of June 8th -14th, 2013 Connelly was paid overtime pay during a workweek when he worked 50 hours on six different non-prevailing wage projects.  (PFOF ¶29)

Because on private projects overtime is paid whenever the employee works more than 40 hours on all projects, and because prevailing wage overtime is supposed to mirror how overtime pay is paid on private projects, hours worked on all projects should be combined to determine eligibility for prevailing wage overtime pay.  Under the contrary rule followed by the Defendants, an employee may receive no overtime pay though he worked 79 hours and 58 minutes during the week, by working 39 hours and 59 minutes each on prevailing wage and non-prevailing wage projects.  Such a result of an employee receiving no overtime pay despite working almost 80 hours during the week clearly would not reflect how overtime pay is paid on private projects, so that it also cannot constitute a plausible interpretation of prevailing wage requirements, which should mirror how overtime pay is paid on private projects in Wisconsin.

For the week ending July 12, 2013 Connelly is therefore entitled to overtime pay for each of his 21 hours worked on prevailing wage projects, after he had worked 40 hours on all projects during the workweek.  Nor can the Defendants successfully argue that it need not pay Connelly for a hour of weekly prevailing wage overtime for each hour of daily prevailing wage overtime pay that it did pay to him:  Wisconsin prevailing wage laws do not contain any provisions similar to Section 207(h)(2) of the FLSA, which permits using paid dollars of daily overtime pay to offset dollars of weekly overtime pay owed to the employee.  Connelly, who received overtime pay for only 2.5 out of the 21weekly prevailing wage overtime hours worked during this week, is owed overtime pay for an additional 18.5 prevailing wage overtime hours.  (PFOF ¶30)  The Plaintiffs

are entitled to summary judgment finding that the Defendants' method of computing prevailing wage overtime pay violated Wisconsin law.

    V.    <u>The Plaintiffs are Entitled to Additional Non-Prevailing Wage Contractual Overtime Pay</u>.

During time periods when the Plaintiffs were not covered by the motor carrier exemption, they are clearly entitled to overtime pay under DWD §274.03, which requires overtime pay whenever they worked more than 40 hours per week; while DWD §274.04 does not permit the Defendants to exempt prevailing wage hours worked when determining eligibility for §274.03 overtime pay. Just like under the FLSA, the Defendants violated Wisconsin law by (a) paying to the Plaintiffs straight time pay for more than 40 hours worked each week; and (b) not counting pre-load and post-unload work hours when determining their eligibility for weekly overtime pay.

The Plaintiffs are also entitled to summary judgment finding that the Defendants violated §109.03(1) in the manner that they calculated the plaintiffs' overtime pay, even during time periods when the Plaintiffs were covered by the motor carrier exemption.  When Plaintiffs Connelly and Raymond Schlicht were hired by the Defendants, they were told by Defendants' owner Daniel Lepke that they would receive overtime pay whenever they worked more than 40 hours per week. (PFOF ¶31) The Defendants' method of paying overtime pay did not change when the Plaintiffs crossed the Minnesota border to perform work, and thereby became subject to the motor carrier exemption.  (PFOF ¶32) In fact, the Defendants paid non-prevailing wage overtime pay to the Plaintiffs during each and every workweek when they worked more than 40 non-prevailing wage work hours.  (PFOF ¶33) The Defendants' promise to pay overtime pay to the Plaintiffs even when they are covered by the motor carrier exemption is fully enforceable under Wisconsin law, at least for work that was performed while the promise was in effect.  See Wis. Stat. §109.01(3) (Defining wages to include advantages, similar to salary, agreed upon by the employer and employee); Wis.

Stat. §109.03(1) (Employees must timely receive full amount of earned wages); *Champine v. Milwaukee County*, 2005 WI App 75 ¶17, 280 Wis. 2d 603 (Ct. App. 2003) (Once work is performed while a revocable unilateral promise was in effect, the employee must be paid pursuant to the terms of said revocable unilateral promise).

For the reasons stated below the Defendants' promise to pay overtime pay, regardless of whether the Plaintiffs were subject to the motor carrier exemption, should be enforced with two modifications:  The provisions that excludes pre-load and post-unload work hours, and that separately keeps track of prevailing wage and non-prevailing wage hours when determining overtime pay eligibility should be deleted:  These provisions are unlawful as applied to prevailing wage overtime, and therefore are also unenforceable as applied to non-prevailing wage overtime.

The Defendants' policy to exclude pre-load and post-unload hours when computing overtime pay eligibility is unlawful when applied to prevailing wage work.  Under Wisconsin's prevailing wage laws employees must receive overtime pay when they worked more than 10 hours per day on all projects, or when they worked more than 40 hours per week on all projects.  All hours worked, including pre-load and post-unload hours that the Defendants concede to be compensable, must be included when computing overtime pay eligibility.  For example, for the week ending March 14, 2014 Connelly reached 40 hours worked for the week at 5:45 p.m. on March 13, 2014. (PFOF ¶34) Assuming Connelly performed an additional ½ hour each of pre-load and post-unload work per day, he would have performed an additional 3.5 hours of work by 7:00 a.m. on March 13, 2014.  This would mean Connelly would have reached 40 hours worked for the week by 2:15 p.m. rather than 5:45 p.m. on March 13, 2014, and would be entitled to an additional 3.5 hours of weekly prevailing wage pay.

By the plain language of its introductory paragraph, the overtime exemptions found in DWD §274.04, including the motor carrier exemption found in §274.04(4) only exempts the employer from paying DWD §274.03 overtime pay; so that even an exempt driver would be eligible to receive prevailing wage overtime pay.  The exclusion of pre-load and post-unload time when determining overtime pay eligibility therefore violated Wisconsin prevailing wage laws, regardless of whether the driver was covered by the motor carrier exemption when the prevailing wage overtime hours were worked.

.       Because the exclusion of pre-load and post-load hours from time worked is unlawful when applied to prevailing wage hours, the exclusion is also unenforceable when computing contractual non-prevailing wage overtime pay.  When one aspect of an agreement is unlawful, whether to invalidate the entire agreement, or to enforce the remainder of the agreement with the unlawful provision severed, depends on the identity of the party seeking to enforce it.  If the party seeking to enforce the contract is not the one whom the law that rendered the contract provision unlawful was designed to protect, then that party should not be permitted to enforce any other provision of the contract to its benefit.  *Baierl v. McTaggert*, 245 Wis. 2d 632, 645 (2001) (Landlord is prohibited from enforcing any other provision of the lease, when the lease contained a provision for the shifting of attorneys' fees that violated Wisconsin statutory law, because landlords would have an incentive to violate the law if they can enforce the unlawful contract provision when the tenants do not complain; and could still enforce all legal aspects of the lease even when they are caught violating the law) *See also Superior Vending Inc. v. Dick's Bar of Hudson*, 2010 U.S. Dist. Lexis 116265 *30 (W.D. WI. 2010) (Where the parties contracted to place both legal and illegal gaming machines in a bar, the Court refused to enforce the part of the parties' profit sharing agreement for the legal machines).  Similarly, because prevailing wage laws were enacted for the

employees' protection, the Defendants should not be permitted to enforce the same provision of excluding pre-load and post-load hours as applied to non-prevailing wage overtime.

On the other hand, when the party seeking to enforce the contract is the one whom the law that rendered the contractual agreement unlawful is seeking to protect, severing the unlawful provision and enforcing the remainder of the contract is appropriate. *Dawson v. Gold-hammer*, 295 Wis. 2d 728, 740-742 (Ct. App. 2006) (When a provision of the lease is unlawful, and the statute making the lease provision unlawful was enacted for the benefit of tenants, the tenants are entitled to enforce the remainder of the lease with the unlawful provision ignored). Similarly, the Plaintiffs are entitled to enforce the remainder of the contract for overtime pay, with the provision calling for the exclusion of pre-load and post-unload hours from time worked deleted.

By the same analysis, the provision of the parties' agreement that separately keeps track of prevailing wage and non-prevailing wage hours worked when determining overtime pay eligibility is unenforceable. As explained above, said provision is unlawful when applied to determining prevailing wage overtime pay eligibility. Under the reasoning of *Baierl* and *Superior Vending*, the provision is also unenforceable when applied to determining non-prevailing wage eligibility. The invalidation of the provision creates a gap as to when the Plaintiffs would be eligible for the promised, non-statutory overtime pay. The Court may supply a term that is reasonable under the circumstances to fill the resulting gap. *Spencer v. Spencer*, 140 Wis. 2d 447 (Ct. App. 1987) (Court may supply a reasonable term when a contract does not address whether maintenance payments must continue following remarriage). Similarly, in this case a reasonable term under the circumstances is that, consistent with DWD §274.03, overtime pay should be paid whenever the Plaintiffs worked more than 40 hours per week on all projects combined. A more stringent

provision on paying overtime pay would violate Wisconsin's prevailing wage laws, and would be unenforceable as applied to non-prevailing wage overtime pay.

The enforceable part of the Defendants' promise to pay overtime pay therefore provides that the Plaintiffs are entitled to overtime pay when working more than 40 hours per week, with prevailing wage, non-prevailing wage, pre-load, and post-unload work hours all counted towards overtime pay eligibility. The Defendants violated the lawful, enforceable provisions of the agreement to pay overtime pay, and therefore Wis. Stat. §109.03(1), by its method of determining the Plaintiffs' eligibility for non-prevailing wage overtime pay. For example, for the week of March 16th through the 22nd, 2014, Raymond Schlicht worked 10.5 hours on a prevailing wage project on Tuesday, and on non-prevailing wage projects throughout the rest of the week, for a grand total of at least 42.5 hours. (PFOF ¶35) Schlicht was entitled to overtime pay after he worked 40 hours per week, including both prevailing wage and non-prevailing wage hours, after his pre-load and post-unload hours are included as his hours worked. Instead, Schlicht received 0.5 hours of prevailing wage overtime pay, and no non-prevailing wage overtime pay for the week. (PFOF ¶36) The Plaintiffs are therefore entitled to summary judgment on liability on their overtime pay by agreement claim.

VI.   The Defendants' Deduction of Wages from Tim Connelly for His Involvement in an Accident Violated Wis. Stat. §103.455.

Sometime in 2013, Timothy Connelly became involved in an accident involving his truck, while he worked for the Defendants. (PFOF ¶37) The Defendants then deducted a total of $4,138 out of 11 of Connelly's paychecks. (PFOF ¶38) These paychecks were deductions from wages earned by Connelly for work he performed for the Defendants between July and October of 2013. (PFOF ¶39) While these deductions were labeled "employee loan repayment", in fact they were payments for losses that the Defendants claim to have sustained as a result of the truck accident.

(PFOF ¶40) Before the deductions were made Connelly never signed a writing authorizing the deductions, Connelly never agreed by a representative that he was at fault for the accident involving his truck, while to date no court has found that Connelly is at fault for the accident in question.  (PFOF ¶41)

Based on these undisputed facts the Defendants' deduction of $4,138 from Connelly's paychecks violated Wis. Stat. §103.455, regardless of whether Connelly was in fact at fault for the truck accident.   Wis. Stat. §103.455 provides in relevant part that no employer may make deductions from the wages due or earned by an employee, for lost or stolen property or damage to property, unless the employee first authorized the deduction in writing, the employee by representative agreed that he was at fault for the lost, theft, or damage to property, or if a court found that the employee was at fault for the lost, theft, or damage to property.   Any written authorization by the employee for the deduction must be given after the loss, but prior to the actual wage deduction.  *Donovan v. Schlesner*, 72 Wis. 2d 74, 81 (1976).  No wage deduction can be made until a determination has been made, pursuant to the statute, that the employee was at fault for the loss.  *Donovan*, 72 Wis. 2d at 80.  Once an employer makes a wage deduction in violation of §103.455, it cannot avoid the statutory violation by proving to a Court, after the fact, that the employee was in fact responsible for the loss.  *Donovan*, 72 Wis. 2d at 82.

In this case, the Defendants made deductions from wages earned by, and therefore due to Tim Connelly.   The deductions were made to reimburse the Defendants for losses to property caused by a truck accident that Connelly was involved in. The deductions violated §103.455 when they were made without Connelly's written authorization, when Connelly never by representative agreed that he was at fault for the truck accident, and when no Court has ever found that Connelly was at fault for the truck accident.   By the plain language of §103.455 and *Donovan*, Connelly is

entitled to twice the amount of the deducted wages, or $8,278, regardless of whether he was ultimately at fault for the truck accident.

VII.    Conclusion.

For the above stated reasons, the  Plaintiffs' motion for summary judgment on liability should be granted in its entirety.

Dated this 22nd day of March, 2018.

s/Yingtao Ho
YINGTAO HO
Wisconsin State Bar No. 1045418
The Previant Law Firm, s.c.
310 W. Wisconsin Avenue, Suite 100MW
Milwaukee, WI   53203
Phone 414/271-4500
Fax 414/271-6308
yh@previant.com

Attorneys for Plaintiffs