UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TIMOTHY CONNELLY
DAVID WINCHELL
RODNEY SCHLICHT,
RAYMOND SCHLICHT,
SCOTT ERLANDSON and
JEFFREY NEMEC

On Behalf Of Themselves And
All Others Sharing A Question
Of Common Interest,

      Plaintiffs

  v.                                                                 Case No. 15-CV-308

DAN LEPKE TRUCKING LLC and
LEPKE TRUCKING & EXCAVATING LLC

      **Defendants.**

## DEFENDANTS' RESPONSES TO PROPOSED FINDINGS OF FACT IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMAR JUDGMENT

Defendants, by their attorney, herewith respond to the Proposed Findings of Fact in Support of the Plaintiffs' Motion for Summary Judgment.

1.    The Court has personal jurisdiction over the Defendants because they reside within this District. (Docket #15, ¶4; Docket #19, ¶4)

Response: Not disputed.

2.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) & (c). (Docket #15, ¶4; Docket #19, ¶4)

Response: Not disputed.

3. The Defendants paid more than 40 hours of straight time pay to Timothy Connelly for the workweek of June 22-28, 2013, to Raymond Schlicht for the workweek of July 26-August 1, 2014, to Rodney Schlicht for the workweek of July 19th– 25th, 2014, and to Scott Erlandson for the workweek of April 26-May 2, 2015.  (Docket #106-1, pg. 3; Docket #106-2, pg. 1; Docket #106-3, pg. 1; Docket #106-4, pg. 1)

Response:  Not disputed.

4. Scott Erlandson never drove outside the State of Wisconsin while he was employed by the Defendants.  (Docket #87, pg. 39:16-18)

Response:  Not disputed.

5. In support of their own motion for summary judgment, the Defendants did not list any interstate driving assignments performed by the Schlichts after March 18, 2014.  (Docket #77, Ex. 3A-3D)

Response:  Not disputed for purposes of summary judgment.

6. When the Defendants later submitted to the Court a declaration outlining evidence that they anticipate would be able to present during a trial on the applicability of the motor carrier exemption, they did not claim that they had additional evidence showing the Schlichts performed interstate work after March 18, 2014.  (Docket #118)

Response:  Not disputed for purposes of summary judgment.

7. The only interstate driving assignments that the Defendants claim Timothy Connelly performed, before November of 2013 when he began to work on the Ames I-90 project, consist of sand hauls from a sand pit to either Genoa, Wisconsin or Chaseburg, Wisconsin. (Docket #118-2)

Response:  Not disputed for purposes of summary judgment.

8. Connelly would pick up the sand from a sandpit located across the final stretch of river from Lansing, Iowa; so that the sandpit was located in Wisconsin if the final stretch of the river between Wisconsin and Lansing, Iowa is the border between Wisconsin and Iowa. (Docket #83, ¶6-10)

Response: Not disputed for purposes of summary judgment despite the ambiguity in the term "the final stretch of the river from Lansing, Iowa."

9. In fact, the border between Wisconsin and Iowa is in the middle of the final stretch of the Mississippi River dividing Lansing, Iowa from the land across from Lansing, Iowa. (Ho Dec. Ex. 1)

Response: Disputed. Daniel Lepke testified that the "Lansing" sand pickup location was in Iowa, not Wisconsin. (Doc. #87, page 51.)

10. As a part of their preview of evidence that they would be able to present in a trial on the applicability of the motor carrier exemption, the Defendants did not claim to possess evidence showing that Connelly actually picked up sand in Iowa, instead argued that the U.S. Army Corps of Engineers dredged up the sand on the Iowa side of the border, before depositing said sand (in Wisconsin) in the sand pit from which Connelly made the sand pickups. (Docket #118, ¶3-D)

Response: Disputed. See response to Finding of Fact No. 9. In addition, Daniel Lepke also identified a second pickup point on Highway 26 north of Lansing, Iowa that was clearly on the Iowa side of the river. [Doc #87, pages 51-53; Deposition Exhibit 10.]

11. The Defendants admit that both themselves and others were permitted to pick up the sand from the sandpit without cost. (Docket #118, ¶3-D)

Response: Not disputed.

12. Daniel Lepke considered criteria such as the individual drivers' familiarity with the customer foremen and the area, the driver's capabilities, and the amount of liability involved in the driving assignment when deciding which drivers to offer which assignments to; and never forced any driver to accept any particular work assignment. (Docket #87, pg. 26, 67-68, 76-77)

Response: Not disputed.

13. Daniel Lepke never forced any driver to accept any driving assignment. (Docket #87, pg. 12, 15)

Response: Not disputed.

14. Daniel Lepke died on September 3, 2016. (Docket #100, pg. 1-2)

Response: Not disputed.

15. The Defendants do not claim to have performed interstate driving assignments for anyone other than Ames Construction during the years of 2014 and 2015. (Docket #77 and exhibits attached thereto, specifically 3F and 3G)

Response: Not disputed for purposes of summary judgment.

16. Daniel Lepke permitted as many drivers as wanted to go to work at the Ames project, so that he never forced anyone to work on the project, and never forceably took anyone off the project. (Docket #87, pg. 19:2-20:20)

Response: Not disputed.

17. The Schlichts did not work on the Ames project after March 18, 2014 because they told Daniel Lepke that they no longer wished to work the number of hours that were required by Ames. (Id. Pg. 22:9-22:11)

<u>Response</u>: Not disputed for purposes of summary judgment.

18. Erlandson specifically told Daniel Lepke that he did not want to go up and perform work at the Ames Project. (Id. Pg. 40:1-3)

<u>Response</u>: Not disputed.

19. The Defendants maintained a uniform policy of paying their drivers only for the hours, for which they received payment from their customers. (Docket #107, pg. 50)

<u>Response</u>: Not disputed with respect to contractors such as Ames Construction, Mathy Construction and the Kraemer Company. Disputed with respect to services rendered for Lepke businesses and private parties.

20. In a letter she provided to drivers of Dan Lepke Trucking, Ruth Lepke explained this policy as: "Start AM is when the truck is loaded. Stop PM is when the truck is unloaded". (Id. Pg. 47-48; Ho Dec. Ex. 2)

<u>Response</u>: Not disputed.

21. Complying with this policy, the Plaintiffs did not write down on their time cards their hours worked before their trucks were loaded for the first time on the day, and after their trucks were unloaded for the final time on the day. (Docket #25, ¶5; Docket #26, ¶5)

<u>Response</u>: Disputed. When the customer allowed return time the drivers included the return time (after their vehicles were unloaded) on their time cards.

22. Work activities the Plaintiffs performed, which time they did not write down on their time cards, included time spent learning their work assignments, warming up their trucks, performing pre-trip inspections, driving to the first loading site for the day, waiting at the first loading site to be loaded, driving from the final unloading site back to the shop, fueling trucks,

performing a post-trip inspection of the trucks, and completing paperwork.  (Docket #25, ¶2, 5, 9-18; Docket #26, ¶2, 5, 10-19)

<u>Response</u>:  Disputed with respect to return times and also disputed with respect to time spent fueling and completing paperwork during the course of the workday.  Also disputed with respect to operations that did not involve contractors such as Ames Construction, Mathy Construction and the Kraemer Company.

23. In response to the Plaintiffs' Complaint, the Defendants did not dispute that many of the work activities, for which the Plaintiffs did not receive separate hourly compensation, were integral to their principle activities and/or compensable.  (Docket #15, ¶50-53; Docket #19, ¶50-53)

<u>Response</u>:  Disputed as to whether the work activities were compensable.

24. The Defendants used time records completed by the Plaintiffs to bill their customers accurately for the Plaintiffs' work, and/or to keep track of the work performed by, and the mileage driven by the Plaintiffs.  (Docket #15, ¶53; Docket #19, ¶53; Docket #25, ¶4)

<u>Response</u>:  Not disputed.

25. The Defendants credited as having worked more than 40 hours during the workweek Timothy Connelly during the workweek of June 22-28, 2013,  Raymond Schlicht during the workweek of July 26-August 1, 2014, Rodney Schlicht during the workweek of July 19th – 25th, 2014, and Scott Erlandson during the workweek of April 26-May 2, 2015. (Docket #106-1, pg. 3; Docket #106-2, pg. 1; Docket #106-3, pg. 1; Docket #106-4, pg. 1)

<u>Response</u>:  Not disputed.

26. During the week ending July 12, 2013 during hours 41-61 Connelly worked on the prevailing wage Highway 35 and Highway 131 Projects. (Ho Dec. Ex. 3; Docket #106-1, pg. 5)

Response: Not disputed.

27. For the week ending July 12, 2013 Connelly received daily prevailing wage overtime pay for the final 4.5 hours worked on Tuesday and the final 2.5 hours worked on Thursday, but did not receive any weekly prevailing wage overtime pay. (Id.)

Response: Not disputed.

28. When the Plaintiffs only worked on non-prevailing wage projects, they received overtime pay whenever they worked more than 40 hours during the week. (Docket #106-1 – 106-4)

Response: Not disputed.

29. For the week of June 8th – 14th, 2013 Connelly was paid overtime pay during a workweek when he worked 50 hours on six different non-prevailing wage projects. (Ho Dec. Ex. 5; Docket #106-1, pg. 1)

Response: Not disputed.

30. For the week ending July 12, 2013 Connelly received overtime pay for 2.5 out of the 21 prevailing wage hours, which he worked after he had already worked 40 total hours for the workweek on all projects. (Ho Dec. Ex. 3; Docket #106-1, pg. 5)

Response: Not disputed.

31. When Plaintiffs Connelly and Raymond Schlicht were hired by the Defendants, they were told by Defendants' owner Daniel Lepke that they would receive overtime pay whenever they worked more than 40 hours per week. (Docket #131, ¶2; Docket #132, ¶2)

Response: Disputed to the extent that the overtime pay was only for hours for which straight time would be paid.

32. The Defendants' method of paying overtime pay did not change when the Plaintiffs crossed the Minnesota border to perform work, and thereby became subject to the motor carrier exemption. (Docket #131, ¶3; Docket #132, ¶3)

Response: Not disputed.

33. In fact, the Defendants paid non-prevailing wage overtime pay to the Plaintiffs during each and every workweek when they worked more than 40 non-prevailing wage work hours. (Docket #106-1, #106-2, #106-3)

Response: Not disputed.

34. For the week ending March 14, 2014 Connelly reached 40 hours worked for the week at 5:45 p.m. on March 13, 2014. (Ho Dec. Ex. 4, pg. 1)

Response: Not disputed.

35. For the week of March 16th through the 22nd, 2014, Raymond Schlicht worked 10.5 hours on a prevailing wage project on Tuesday, and on non-prevailing wage projects throughout the rest of the week, for a grand total of at least 42.5 hours. (Docket #130-1, pg. 2)

Response: Not disputed.

36. For the week of March 16th through the 22nd, 2014, Raymond Schlicht received 0.5 hours of prevailing wage overtime pay, and no non-prevailing wage overtime pay. (Ho Dec. Ex. 7)

Response: Not disputed.

37.     Sometime in 2013, Timothy Connelly became involved in an accident involving his truck, while he worked for the Defendants. (Connelly Dec. ¶2)

Response:  Not disputed.

38.     The Defendants then deducted a total of $4,138 out of 11 of Connelly's paychecks. (Docket #106-1, pg. 7-10, 12-18)

Response:  Disputed to the extent it implies that the deductions were made improperly for damage to property. The deductions were made pursuant to a pre-employment promise made by Connelly. [R. Lepke Decl., ¶ 4-8.]

39.     The total deduction of $4,138 were made out of wages earned by Connelly for work he performed for the Defendants between July and October of 2013. (Connelly Dec. ¶3)

Response:  Not disputed.

40.     While these deductions were labeled "employee loan repayment", in fact they were payments for losses that the Defendants claim to have sustained as a result of the truck accident. (Id.)

Response:  Disputed. The deductions were made pursuant to a pre-employment promise made by Connelly. [R. Lepke Decl., ¶ 4-8.]

41.     Before the deductions were made Connelly never signed a writing authorizing the deductions, Connelly never agreed by a representative that he was at fault for the accident involving his truck, while to date no court has found that Connelly is at fault for the accident in question. (Connelly Dec. ¶4)

Response:  Disputed to the extent it implies that either a written authorization, an agreement or a court determination was required by law. The deductions were made pursuant to a pre-employment promise made by Connelly.

Dated at Madison, Wisconsin this 19th day of April, 2018.

                WESTLEY LAW OFFICES, S.C.

                /s/ Richard A. Westley
                Richard A. Westley, Attorney
                7633 Ganser Way, Suite 100
                Madison, Wisconsin   53719
                (608) 829-2981
                State Bar ID# 1013986